State *v.* Bartlett.

———————◆———————

STATE *versus* DAVID BARTLETT *& als.*

In an indictment for larceny of gold and silver coin, railroad bonds, legal tender notes, and compound interest notes, it is a sufficient allegation of ownership to describe them as "of the goods and chattels" of the owner.

In an indictment for larceny of a large number of different articles, it is not necessary to use the word "and" to connect the descriptions of the several articles.

Upon an indictment charging the felonious breaking and entering of a building, and a larceny therein, after a general verdict of guilty, judgment will not be arrested, if the larceny of a single article is properly alleged; although it may contain insufficient allegations of the larceny of other articles.

Exceptions to allowing the officer for the State to inquire, on cross-examination of a prisoner's witnesses, what his business had been, will not be sustained, when it does not appear what the answer was.

When the identity of the prisoner is a material question, and a witness for the government has testified to an acquaintance with him, the witness may be asked where it was, and what was his own business.

The Act of 1864, ch. 280, allowing a person charged with crime to be called as a witness at the trial, "at his own request but not otherwise," is constitutional.

The fact that he does not testify is a proper one for the consideration of the jury in determining the guilt or innocence of the accused.

On the trial of an indictment, the presiding Judge may, in his discretion, appoint a counsellor of the Court to assist the attorney for the State; and the fact that such person may expect compensation for services thus rendered will not deprive the Court of the power to appoint him.

State *v.* Bartlett.

On Exceptions.

Indictment, the material portions of which are as follows:—

"Sagadahoc, ss.—At the Supreme Judicial Court, begun and holden at Bath, within and for the county of Sagadahoc, on the first Tuesday of April, in the year of our Lord one thousand eight hundred. and sixty-seven—

"The jurors for said State upon their oath present, that David Bartlett alias Fitz Erald alias J. Dunbar, Orrin Syms alias Orrin Burns alias Rory Syms alias Rory Burns, and Edward Maguire, late of the city, county and State of New York, now cormorant at Augusta, in the county of Kennebec and State of Maine, laborers, on the twenty-second day of June, in the year of our Lord one thousand eight hundred and sixty-six, with force and arms at Bowdoinham, in said county of Sagadahoc, in the night time, feloniously did break and enter the bank of the 'National Village Bank of Bowdoinham,' a banking association duly and legally established and organized at said Bowdoinham, there situate, and a certain amount of gold coin of the value of sixty-five dollars, a certain amount of silver coin of the value of seven dollars and seventy-five cents; six Portland and Kennebec Railroad bonds of the following numbers, to wit:—numbers one, seven, fifty-six, fifty-eight, fifty-nine and one hundred and seven, each for one thousand dollars, and of the value of one thousand dollars each; four Portland and Kennebec Railroad bonds numbered as follows, to wit;—sixty-five, sixty-six, eighty-six and eighty-seven, each of five hundred dollars, and each of the value of five hundred dollars; one Consolidated Interest Railroad bond, number thirty-two, of the value of one thousand dollars; certain bank bills current as money in this State, to a large amount, to wit:—to the amount of three thousand four hundred and eighty-one dollars, of the value of three thousand four hundred and eighty-one dollars; certain Legal Tender Notes to a large amount, to wit:—to the amount of three thousand seven hundred and fifteen dollars, and of the value of three

State *v.* Bartlett.

thousand seven hundred and fifteen dollars; certain Compound Interest Notes to a large amount, to wit:—to the amount of fourteen hundred and thirty dollars, and of the value of fourteen hundred and thirty dollars, of the goods and chattels of the said 'National Village Bank of Bowdoinham;' five United States bonds, numbered 49,816, 49,817, 49,818, 49,819, 49,820, of the bonds of the United States issued under the Act of July 7th, 1861, and of the supplementary Act of August 5th, 1861, each of one thousand dollars, and each of the value of one thousand dollars; three United States Treasury Notes dated August 15th, 1864, numbered 100,923, 100,924 and 100,925, of one thousand dollars each, and each of the value of one thousand dollars, of the goods and chattels of William Purrinton of said Bowdoinham, being then and there deposited and found in the bank aforesaid;" [here follows a description of other property in similar language;] "three United States treasury notes of one hundred dollars each, and each of the value of one hundred dollars, of the goods and chattels of Thomas Spear of Bowdoinham, being then and there deposited and found in the bank aforesaid; feloniously did steal, take and carry away, against the peace of said State, and contrary to the statute in such cases made and provided.

" And the jurors aforesaid upon their oaths aforesaid do further present, that David Bartlett alias Fitz Erald alias J. Dunbar, Orrin Syms alias Orrin Burns alias Rory Syms alias Rory Burns and Edward Maguire, late of the city, county and State of New York, now cormorant at Augusta, in the county of Kennebec and State of Maine, laborers, on the twenty-second day of June, in the year of our Lord one thousand eight hundred and sixty-six, at Bowdoinham, in said county of Sagadahoc, with force and arms a certain building there situate, then and there occupied as and for a banking house by the 'National Village Bank of Bowdoinham,' a banking association duly and legally established and organized at said Bowdoinham, in which building were then and there kept valuable things and articles of value, to wit:

State *v.* Bartlett.

specie, bank notes current in this State, promissory notes and bills of exchange, which were articles of value, and other articles of value belonging to said bank, feloniously did break and enter in the night time and certain gold coin to a large amount, to wit:—to the amount of sixty-five dollars, of the value of sixty-five dollars; certain silver coin to a large amount, to wit:—to the amount of seven dollars and seventy-five cents," &c., as in the first count.

Before empanneling the jury, the County Attorney moved that George F. Shepley, Esq., be appointed by the Court to assist in the prosecution.

Counsel for the prisoners objected unless it should appear that he was not employed for compensation by other parties, and desired to propound inquiries to him, to ascertain whether he was so employed, and whether he was to act for pecuniary compensation.

The Court ruled that when it appears to the Court that such facts and circumstances exist that the public interests require that the State's Attorney have the aid of some counsellor of the Court in the trial of the cause, the Court will appoint such person as may seem to them best fitted under the circumstances to aid in the promotion of justice; and the fact that such person may expect compensation, for services thus rendered, will not deprive the Court of its power to appoint him, but the Court may, in the exercise of its discretion, appoint or refuse to appoint under such circumstance. General Shepley may, in this case and at his pleasure, answer the inquiry of the prisoners' counsel concerning his expectation of compensation.

Gen. Shepley said, I propose to answer. I am employed at the request of the prosecuting officer. I was applied to by the officers of the bank, and asked the compensation. I stated to them that it was a matter that I would not decide till the case was ended. I now say to my learned friend, and I now say to the prosecuting officer who employed me, I say to the officers of the bank, that when this case is ended that they may or not pay my actual pecuniary expen-

State *v.* Bartlett.

ses. I make no conditions in regard to that, and that if they will put into the hands of Mrs. Sampson, who has been a friend to the soldiers, a sum equal to that received by the learned counsel who raised the objection, I will neither ask nor receive one farthing of pecuniary compensation for my personal services.

The counsel for the prisoners then said : — The objection is not waived. It is claimed that, according to the statement of Gen. Shepley, he does receive and is to receive pecuniary reward.

Mr. Shepley replied : — I make it purely voluntary whether they give anything or not. I waive any claims. I would not have made this offer if the Court had not, previously to my making it, granted the request of the county attorney. The Court having so decided, I waive any other claims, leaving the question entirely to their generosity what they shall give to the orphan asylum in Bath, trusting they will make it equal to the fee of my learned brethren.

The Court appointed Gen. George F. Shepley to assist the State's attorney, the duly elected county attorney being absent, and Francis Adams having been duly appointed for the term.

Evidence was offered on the part of the government, that certain United States bonds and other securities, described in the indictment, were stolen from said Bank. This evidence was seasonably objected to on the ground that said bonds and securities were not alleged in the indictment to belong to any person, but to be "of the goods and chattels" of persons named ; and because it was not alleged in the indictment that said bonds and securities were stolen. This objection was overruled, and the evidence was received.

William.Murphy was examined by the defence, to prove that Edward Maguire was in New York on the 22nd of June, 1866; and the transactions of that day were fully inquired into by counsel on both sides. Counsel for the government then inquired of the witness what was the business of Edward Maguire? This question was objected to

but allowed; and subsequently the same cross-interrogatory was addressed to Maguire's witnesses by the government against the objection of respondent's counsel.

Moses Sargent, a witness for government, was inquired of, how long he had been acquainted with Bartlett? He answered that he was acquainted with him about fourteen years ago for a few years, and from ten years till recently was not acquainted with him. Where was Bartlett when you saw him? Objected to, and objection sustained. Where were you, what was your business? Objected to but allowed. Witness answered that he was an officer in a certain State's Prison. There was no other evidence tending to prove that Bartlett had been a State's Prison convict.

The respondents excepted to the foregoing rulings, to the overruling of their motion in arrest of judgment, and to certain instructions of the presiding Judge which are fully stated in the opinion.

*Tallman & Larrabee,* for the respondents.

At the trial of the cause the presiding Judge erred in the following particulars, — viz. :

1. In allowing Gen. Shepley to appear in and argue the case to the jury.

*a.* He was employed by, and was acting in the case, for and as the attorney of said bank.

*b.* Such course is in violation of the policy of the laws, as well as in contravention of the requirements of the statutes of this State.

"In cases of felony it is the duty of the counsel for the prosecution to be assistant to the Court in the furtherance of justice, and not to act as counsel for any particular person or party." *Regina* v. *Thursfield,* 34 Eng. C. L. R., 385.

In opening the case, Corbet, for the prosecution, said he "apprehended his duty as counsel for the prosecution was not to consider himself as counsel for any particular side or party."

GURNEY, B., said :—"The learned counsel for the prose-

cution has most accurately conceived his duty, which is to be assistant to the Court in the furtherance of justice," &c. Ibid.

*c.* The Court will not allow an attorney, who is employed by, or expects any compensation from an interested party, to assist the prosecuting officer in the trial of a criminal cause for felony,—much less to argue the cause to the jury. *Com.* v. *Knapp,* 10 Pick., 476; same v. *Williams,* 2 Cush., 582; same v. *King,* 8 Gray, 501.

2. Such employment is forbidden by the statutes of this State.

*a.* The prosecuting officer is an officer of the law, acting under an oath which prohibits his receiving any " fee or reward, for or in behalf of any prosecutor for official services. R. S., c. 67, § 35; same 79, § 19.

*b.* The attorney employed in this case was also bound by his oath to "conduct with all good fidelity" to his clients. R. S., c. 79, § 22.

Suffering additional counsel to appear for the prosecution, is within the legal discretion of the Judge, but the Judge is not justified in violating the policy of the law, much less the requirements of the statute.

In this case, therefore, we conclude the appearance of Gen. Shepley was improper and illegal.

3. In allowing the counsel for the government to inquire of defendant Maguire's witness "what was the business of Edward Maguire."

*a.* The question was either irrelevant or designed to prove that his character was bad.

*b.* In either case it was improper and illegal. *State* v. *Upham,* 38 Maine, 261.

" Even in a prosecution for stealing a particular horse, it cannot be given in evidence against the defendant that he associated with horse thieves." Bishop on Crim. Proceed., § 488.

" Actions, looks, words, steps, form the alphabet by which you may spell character." Worcester's Dict.

4. So, also, in allowing Sargent to testify where he was and what was his business, when he was acquainted with Bartlett.

5. So, also, in instructing the jury that this bank was within the purview of the statute.

a. This was not such a bank as was intended to be embraced by it. It referred only to state and not to national banks.

b. Neither is the building mentioned in the second count such a one as is intended by the phrase "other building in which valuable things are kept."

6. In instructing the jury that the "indictment also *properly* charges the larceny of gold and silver coin, and other bonds specified and particularly described therein, and is not limited, as the prisoners' counsel contends, to the treasury notes of Thomas Spear."

a. What might have been intended to have been charged in the indictment, we know not; but we apprehend its correct reading shows only a charge of larceny of notes of Thomas Spear.

b. This clearly appears from inspection of the indictment.

c. There is no allegation in either count of the indictment, that the supposed property of said bank, was in the bank, or other building, at the time of its alleged breaking, or any larceny of it committed "therein."

d. Neither is any of the property or its ownership "proply" charged or described as "goods and chattels." R. S., c. 120, § 1; Bishop's Crim. Law § 357; *Regina* v. *Powell*, 6 British Crown Cases, 401; *U. S.* v. *Davis*, 5 Mason, 356; *Rex* v. *Hill*, 1 British Crown Cases, 189; *Rex* v. *Mead*, 19 Eng. Com. Law. Rep., 514; *Rex* v. *Vise*, &c. 2 Br. Cr. Cases, 218; *Rex* v. *Henry Clark*, 1 Br. Cr. Cases, 181.

7. The Judge also erred in instructing the jury that "the fact that they might be witnesses or not, as they chose, and did not offer themselves as witnesses, is a fact in the case, and proper for your consideration. The necessary infer-

ence, if any, arising from it, is for you to determine." Constitution of Maine, art. 1, § 6; Statute of Maine, 1864, c. 280; Stat. of 1865, c. 312.

*a.* This instruction is not only unwarranted by law, but calculated to mislead the jury.

8. The Judge also erred in stating to the jury — "and here let me remark, gentlemen, that the law does not require you to believe as jurors what you cannot believe as men. There is no such distinction known to it."

*a.* This instruction abolishes all distinction of the quantity of proof required, between civil and criminal cases.

"Where the instruction was, that it is not necessary the jury should be satisfied of the defendant's guilt to the exclusion of a reasonable doubt; but if, from the evidence, they should believe him guilty "they should so find,"—this was held to be wrong, as was also the instruction "that the jury should weigh and consider all the facts .and circumstances proven to their satisfaction, in connection and combination, and should hold them and pass judgment on them in that condition; and that, if the conclusion from the facts and circumstances so proven to their satisfaction be, that there is that degree of certainty in the case, that they would act on it in their own grave and important concerns, that that is the degree of certainty which the law requires, and which will warrant and justify them in returning a verdict of guilty." 1 Bishop on Crim. Proceed., 819.

*b.* In civil cases, a preponderance of testimony is sufficient, but in criminal, the defendant has the presumption of innocence in his favor, and the crime must be established beyond a reasonable doubt.

*c.* This instruction deprives the defendant of the benefit of the legal presumption of innocence, and excuses the government from proving the case beyond a reasonable doubt.

"In a criminal case, the establishment of a *prima facie* case does not, as in a civil case, take away from the defendant the presumption of innocence, or change the burden of

proof," the State is required to prove beyond all reasonable doubt, the facts which constitute the offence. The establishment, therefore, of a *prima facie* case merely, does not take away the presumption of innocence from the defendant, but leaves that presumption to operate in connection with, or in aid of, any proofs offered by him to rebut or impair the *prima facie* case thus made out by the State." 1 Bishop's Crim. Proceed., § 503.

*d.* "In civil cases, their duty is to weigh the evidence carefully, and to find for the party in whose favor the evidence preponderates, although it be not free from reasonable doubt." 3 Greenleaf on Evidence, § 29; *Com.* v. *Webster*, 5 Cush., 320.

*Frye, Attorney General,* for the State.

TAPLEY, J. — This is an indictment for breaking and entering the National Village Bank of Bowdoinham and stealing therefrom a large amount of coin, bills, bonds and U. S. treasury notes. The prisoners being convicted, now raise certain questions pertaining to the sufficiency of the indictment, and to the regularity of the proceedings on trial.

1. It is alleged by the prisoners' counsel that there is no sufficient allegation of property or ownership in articles alleged to be stolen.

The several articles of property alleged to be stolen, after being particularly and specifically described, are alleged to be " of the goods and chattels of " several persons therein named. No objection is made to the form of this allegation, but it is urged that coin, bills, bonds and treasury notes are not goods and chattels, and therefore there is no allegation of ownership.

Every indictment for larceny must allege an ownership of the property stolen, and would be defective without such allegation, but there are no particular words or phrases which the law requires should be used. This allegation, it should

be noticed, is one of ownership purely, and in no manner or part descriptive of the things stolen. The descriptive allegations are full and complete, and the only question arising under this objection is, whether this sufficiently alleges the property in the individuals named.

To constitute an allegation of ownership, such words must be used, and in such succession and connection that they convey clearly to the ordinary mind the idea, that a certain person or persons named, are the owners of the stolen property. This may be done by a variety of words and phrases, any of which will be sufficient, if they clearly convey the idea that such persons are the owners.

Viewed in this light, can there be any question as to the signification of these words as they are here used? Is or not the idea, or the fact, that certain persons were the owners of the property stolen, clearly conveyed? Will any doubt, in *any* mind of ordinary capacity arise, concerning it? If not, it is because such words are used as convey one and the same idea upon this point to all persons. If they do convey clearly to the ordinary mind the fact, that certain persons were the owners, that is all that is required. A few citations showing the sense in which these words have been used and understood may not be inappropriate.

" An allegation in an indictment, that the bank bills were the goods and chattels of A, is a sufficient averment that they were his property; the word chattels denoting property and ownership." *People* v. *Frost*, 1 Doug., 42, (7 U. S. Dig., 340.)

" Coin is included under the general terms ' goods and chattels,' as used in the 26th section of the crimes Act of 1831." *Hall* v. *the State*, 3d Ohio, (N. S.,) 575, (15 U. S. Dig., 377.)

" Chattels personal are generally such as are moveable, and may be carried about the person of the owner wherever he pleases to go ; such as *money*, jewels, garments, animals, household furniture, and almost every description of property of a moveable nature." Holthouse's Law Dict., 'Chattels.'

State *v.* Bartlett.

" Chattels personal are property, and, strictly speaking, things moveable ; which may be annexed to or attendant on the person of the owner and carried about with him from one part of the world to another ; such are animals, household stuff, *money*, jewels, *coin*, garments and everything else that can properly be put in motion and transferred from place to place." 2 Black. Com., 387.

" The terms, ' goods and chattels,' includes choses in action as well as those in possession." 12 Co., 1 ; 1 Atk., 182.

" Chattels is a more extensive term than goods or effects." " The terms ' goods and chattels,' includes not only personal property in possession, but also choses in action." " The word ' *goods*,' simply, and without qualification, will pass the whole personal estate, when used in a will, including even stocks in the funds." Bouv. Law Dict., " Chattels."

. " Any moveable property or goods, as furniture, plate, *money*, horses," &c. Worcester's Dict., " Chattel."

" Chattel is a very comprehensive term in our law and includes every species of property which is not real estate or a freehold." Burrill.

In *Commonwealth* v. *Richards*, 1 Mass., 338, SEDGWICK, J., says : — " The indictment alleges that the defendant stole a bank note of the value of ten· dollars, of the goods and chattels, &c. This is a sufficient allegation of property and value, and, in my opinion, as particular in description as the law requires."

In the *People* v. *Holbrook*, 13 Johns., 90, four promissory notes, commonly called bank notes, were alleged to be the goods and chattels of P. C., and it was held sufficient without saying they were the property of P. C. " Chattels" denoting property and ownership.

Such use of these terms, continued for so long a time, taken in connection with the very apparent fact that they do, as used in this case, clearly convey the idea of ownership, and nothing else, leads us to the conclusion that this indictment has a sufficient allegation of ownership.

It has been held that, in an indictment of this kind, the words " of the goods and chattels," may be rejected as surplusage and the remaining words will be sufficient. *Com. v. Eastman*, 4 Gray, 416, and cases there cited.

If they are so immaterial that they may be rejected as surplusage, and then sufficient remains, it is quite clear a sufficient allegation is found, whether rejected or not. If they qualify the remaining words, they cannot be rejected and thus enlarge or diminish the remaining words ; and, if they do not, a rejection is not necessary to make the allegation sufficient.

We have no doubt the allegation is sufficient as it stands.

2. It is contended there is no allegation of a larceny, except as to the treasury notes of Thomas Spear ; and that this arises from the omission of the connecting word "and," between the different articles of property described. We think the word " and" was not necessary to connect the property described with the allegation of feloniously stealing, taking and carrying away. This form of declaring is not unusual. It had been practiced in Massachusetts before we became a State, and has been, there, and here ever since. See Davis' Precedents and Train & Heard's Precedents.

3. It is also urged that there is no sufficient allegation of a larceny *in the bank* of the articles alleged to be the property of the bank. That while the indictment charges all the rest of the property as " being then and there deposited and found in the bank aforesaid," there is no such allegation as to the property alleged to belong to the bank.

The property belonging to other persons was, in fact, *deposited* in the bank *for safe keeping*, hence the allegation in relation to those articles.

The allegation in relation to the bank property is substantially that the prisoners broke and entered the National Village Bank of Bowdoinham, and certain described property " feloniously did steal, take and *carry away*."

This, it is contended by the government officer, is a suf-

ficient allegation of stealing, taking and carrying away *from the bank*.

The objection here raised, if of any importance at all, is now open to the prisoners only upon their motion in arrest of judgment.

Their objections to the introduction of evidence were specific, and confined to two alleged causes; one was, "that said bonds and securities were not alleged in the indictment to *belong* to any person," but to be " of the goods and chattels of persons named," and the other cause assigned was, "because it was not alleged in the indictment" that "said bonds and securities were stolen." These objections we have considered and find them unsound in theory and practice. The question now presented arises legitimately upon the motion in arrest, and we think it cannot avail the prisoners, even upon the construction of the indictment they contend for.

The offence which they are indicted for, consists of the breaking and entering the bank and committing a larceny therein. The amount stolen from the bank is immaterial. The offence is as complete by the larceny of one dollar as of eighty thousand.

If the prisoners broke and entered the bank and stole the treasury notes of Thomas Spear therefrom, the offence charged has been committed.

It is not claimed by the prisoners' counsel that the objection here raised applies to any of the articles other than those belonging to the bank. All the rest of the property being free from this objection, even though the point was well taken as to the property of the bank, judgment will not be arrested. While the indictment is well drawn as to the larceny of a single article, judgment will not be arrested upon a general verdict of guilty.

In *Commonwealth* v. *Williams*, 2 Cush., 588, it is said, " But, in reference to the offence upon which this indictment is found, and for which the defendant is to be punished, the amount of property stolen does not enter into the offence,

or affect the statute punishment. It is the breaking and entering in the night time a public building, and stealing therein, that is the subject of. punishment under the statute."

"It is well settled that, upon an indictment charging a *larceny* of various distinct articles of property, some of which are technically described, and others not so, and a general verdict of guilty is found by the jury, the insufficiency of the description as to certain articles has no other effect than to strike them out of the indictment, and the verdict is to be applied to the whole property, which is properly and sufficiently charged to have been stolen, and, for the larceny of such property, the punishmnnt is to be awarded." We have not found it necessary, therefore, to consider or decide upon the question of the sufficiency of the charge of larceny of bank bills. Independent of that charge, there is a larceny technically and properly set forth in this indictment.

For the same reason we do not find it necessary to consider or decide upon the sufficiency of the allegation concerning the articles described as belonging to the bank, because, independently of that charge, there is a larceny from the bank of many other articles, technically and properley set forth in this indiçtment.

4. The counsel for the government was allowed to inquire of Maguire's witnesses, "What was the business of Edward Maguire?" This inquiry was put upon cross-examination. It does not appear what the answer was, hence it does not appear that he was aggrieved by the allowance of the question. We can conceive of many reasons why such a course of inquiry might well be allowed, but, as the answer does not appear, or even that an answer was made at all, it becomes unnecessary to examine it.

5. "Moses Sargent, a witness for the government, was inquired of, how long he had been acquainted with Bartlett? He answered that he was acquainted with him about fourteen years ago, for a few years, and from ten years till recently was not acquainted with him." He was then asked

"where was Bartlett when you saw him?" The prisoners' counsel objecting, the objection was sustained. Subsequently the witness was asked, "where were you and what was your business?" The prisoners' counsel objected, but the Court allowed the witness to answer, and he answered that he was an officer in a state's prison.

No request was made to have the answer stricken out or other objection made.

The inquiry and answer objected to proves nothing. The answer could not have been anticipated by the presiding Judge. The identity of the prisoner being an important inquiry, it was competent to show the acquaintance and familiarity of the witness with the prisoner.

If the counsel feared an incorrect and unfavorable inference would arise from it, he could have pursued the inquiry upon cross-examination and elicited any other facts within the knowledge of the witness which would remove the unfavorable impression he may have feared, or he could have introduced the prisoner, Bartlett, to make any explanation. It is urged that the inference to be drawn from this inquiry and answer is that Bartlett was a convict in some State's prison. Why the counsel thus concludes he does not state; certain it is there is no such necessary inference arising. The answer does not state that either the prisoner or witness was in a State's prison when he saw him. If there was danger that any improper inference would be drawn, how easy for the prisoners' counsel to have inquired where they in fact were, or to have introduced the prisoner to state the fact concerning the matter. If he sees fit to lay by and trust to any inference which he thinks may arise from such an answer, taking no means to avoid it, he cannot now urge it as a cause for new trial. As before remarked, the inquiry and answer prove nothing for or against the prisoner, and the fears of counsel must have some other foundation than anything appearing in the question and answer.

6. The Court instructed the jury "that the laws of this State permit these defendants to testify in their own behalf

if they desire.   Whether they will or not is at their option. The government cannot make them witnesses.   They cannot compel them to go upon the stand.   If they choose to, the government cannot exclude them.   The fact that these prisoners have not testified is apparent to you.   The reason why, is not, except from the statement of their counsel. The law presumes nothing concerning it.   It is a matter of fact, and no legal inferences or presumptions arise from it. The fact that they might be witnesses or not, as they chose, and did not offer themselves, is a fact in the case and proper for your consideration.   The necessary inference, if any, arising from it, is for you to determine.   If the government has failed to prove their guilt there was no necessity for them thus to testify.   If the evidence they have produced raises a reasonable doubt of their guilt, then there is no occasion for them thus to testify, for that entitles them to a verdict."

To this instruction the prisoners'. counsel takes exception, because the jury were allowed to take into consideration the facts that the defendants did not offer themselves as witnesses.

The argument of the learned counsel for the prisoners, in support of his objections, proceeds principally upon the assumption that the Act, admitting defendants in criminal cases to be witnesses in their own behalf, is in contravention of that provision of the bill of rights which provides that the accused "shall not be compelled to furnish evidence against himself."   Const. Maine, art. 1, sec. 6.

The Act provides that, " in all indictments, complaints and other proceedings against persons charged with the commission of crimes and offences, the person so charged shall, at his own request, but not otherwise, be deemed a competent witness," &c.   Acts of 1864, c. 280.

We do not perceive any conflict between this Act and the provision recited from the bill of rights.   The Act carefully guards the rights of the accused, and leaves it entirely at his option to testify or remain silent.   He cannot now be com-

pelled to furnish evidence against himself any more than before the passage of the Act. He may now be as reticent as before, if he chooses. The only difference is that, before the Act, he *must* be silent, and now he *may*.

The difficulty which is suggested, however, in its practical operation, is that, if he does not avail himself of the opportunity offered, an unfavorable influence arises, and, if he does and tells the truth, he must convict himself, and therefore he is between two straits. If this be so, it by no means follows that the Act is in conflict with the rule referred to in the bill of rights.

We are not aware that such a construction has ever been given this provision in the bill of rights; on the contrary, the construction now contended for is in conflict with certain well known rules of evidence of long and frequent practice in our courts.

If a person accused remains silent when he may speak, he does so from choice, and the choice he makes upon such occasions has always been regarded competent evidence. It is the *act* of the party. From time immemorial the reply or the silence of the accused person, when charged, has been regarded as legitimate evidence on his trial for the consideration of the jury. Any act of his, when charged, tending to sustain the charge, may be proved. Fleeing from arrest, giving contradictory, untrue or improbable accounts of the matters in issue, and refusals to account for the possession of stolen property, are evidences of guilt admitted upon the trial of the persons accused. These are proofs derived from the prisoner's acts, sayings and silence. He never has been, and is not now compelled to furnish the Court the evidence of the existence of these facts. If it be said, these are the voluntary acts of the prisoner, the manifest answer is, they are not more so than the refusal or neglect to testify.

When found in the possession of stolen property and inquired of concerning it, he *must* speak or be silent.

When found with the implements used in a recent burg-

lary and interrogated in reference to them, he *must* answer or be silent.

When found with the bloody instruments of a foul murder, and he is called upon to explain his possession, he *must* answer or be silent.   There is no escape from this.   He is in the strait betwixt the two.   He must choose the one or the other.   He must speak or be silent.   Yet, in all these cases, it has been the uniform practice of the Court to admit in evidence the conduct of prisoners upon such occasions, and it never has been held an infringement of the rule referred to.

A distinguished writer upon criminal law says, —" Where a man at full liberty to speak and not in the course of a judicial inquiry is charged with a crime, and remains silent, that is, makes no denial of the accusation by word or gesture, his silence is a circumstance which may be left to the jury."   Wharton's Criminal Law, 320.

The Act in question imposes no obligation upon the prisoner to testify ; it only affords him an opportunity so to do, if he choose.   It changes his condition only in adding one more opportunity to speak or be silent, and the same rule applies to the result which has been applied to such cases for a long time.

We are not aware that any Court has ever extended the rule so far as now contended for by the counsel for the prisoners.   To do so would work manifest injustice to all except the *guilty*, and overrule the law-making power.

The proposition is substantially this, a law which gives an *innocent* person, who is accused of an offence, an opportunity to relieve himself from suspicion and punishment, and opens his mouth that he may declare and prove his innocence, must be declared unconstitutional because the *guilty* man who is accused, may, if he takes the stand to testify, get caught in the meshes of his own falsehoods, and, if he does not testify, is liable to an inference unfavorable to his escape from the punishment he deserves.

From this it would result, that the innocent man must be

deprived of this great privilege and allowed to suffer, that the guilty may the more readily escape.

Such a proposition, involving such results, added to the overruling of the law-making power, can be adopted only upon some positive, unyielding principle of law requiring it. Such requirement we do not find, and we have no doubt the Act is constitutional in its spirit, letter and design; and our observation of its practical operation does not lead us to the same conclusion of the impolicy of its enactment, which has been expressed by the counsel for the prisoners.

It is insisted further, that, if the law is not in conflict with this provision in the bill of rights, still the jury should not be allowed to consider the fact that the prisoner prefers to be silent on his trial.

The reason suggested is, there is danger the jury will attach too much importance to the fact.

If this were so, it might by some be regarded as strong an argument against the jury system as against the admissibility of the evidence. It is a fact, and one not resting upon dubitable evidence for proof, but apparent to the jury themselves. That an inference does arise is admitted, and is undeniable. It is evidence. The force of it may depend upon circumstances. Now, that a fact which is evidence, must be excluded because the jury may misconceive its force and value, is certainly a novel proposition. As we have said before, evidence of this kind has always been entrusted with the jury, and no serious consequences resulted from it.

The danger apprehended has two antidotes; one lies in the intelligence of the jury, where the security of a proper consideration of every other fact lies, and the other remedy lies with the prisoner himself. If in silence there lies insecurity, the law in its beneficence allows him to break silence and avoid the danger arising from it. If he has so conducted himself that he thus encounters greater difficulties, the fault is his own and not that of the law. The instructions

upon this point were quite as favorable to the prisoners as they were entitled to.

The jury were instructed, " that the law presumed nothing concerning it; that the omission upon their part to testify must not be regarded as a confession of guilt; that it did not change or diminish the proof required to authorize a verdict; that, if the government had failed to prove their guilt, there was no necessity for them to testify; that, if the evidence they had adduced in defence, raised a reasonable doubt of their guilt, then there is no occasion for them to testify, for that would entitle them to a verdict."

From this it is apparent the government were required to establish the guilt of the prisoners *independent* of any inferences which might arise from their silence.

This we think was erroneous, and a more favorable instruction than they were entitled to.

We regard it a fact in the case, proper for the consideration of the jury, upon the question of guilt or innocence, and if, when a cause is submitted to the jury, the facts proved in the case, combined with this fact, satisfies them beyond a reasonable doubt of the guilt of the prisoners, their verdict should be guilty.

The particular weight to be attached to this circumstance must depend upon the circumstances of each case, and be entrusted to the good sense and intelligence of the jury, under the advice of the Court.

If the defence is an *alibi*, and numerous witnesses have testified to all the facts which, from the nature of the defence the prisoner could, his testimony could add only the force of one more witness, (and that an interested one,) to the same facts, and, in such case, the inferences arising from silence would possess much less force, than if the defence involved facts peculiarly within his own knowledge, and only slight and indirect proof of it had been exhibited by him. No fixed and definite rule can be laid down with reference to it. The same tribunal is entrusted with this fact that is entrusted with all the others in the case, and the same

intelligence and integrity must be the security of the prisoner and the public, that it will be properly weighed and considered.

The presiding Judge in this case, to guard the prisoners against any unwarranted inferences, deprived the government of the whole force of the fact, by requiring it to prove all that was necessary for a conviction without it.

Another cause has been assigned as a reason for granting a new trial which may be entitled to a brief notice.

The state's attorney for the county being absent, the Court appointed Francis Adams prosecuting officer for the term. Before proceeding with the case to the jury, for reasons assigned by him, he moved that George F. Shepley, Esq., a counsellor of this Court, be allowed to assist him in the trial of the case to the jury, and he was allowed so to do by the Court, the prisoners' counsel objecting, because it appeared, as they claimed, "that he does and is to receive pecuniary reward" from some parties for such services.

Before the appointment, the presiding Judge stated the rule in such cases to be, "that when it appears to the Court that such facts and circumstances exist that the public interest requires that the state's attorney have the aid of some counsellor of the Court in the trial of the cause, the Court will appoint such person as may seem to them best fitted under the circumstances to aid in the promotion of justice; and the fact that such person may expect compensation for services thus rendered will not deprive the Court of its power to appoint him, but the Court may in the exercise of its discretion, appoint or refuse to appoint under such circumstances."

The power to appoint a counsellor of the Court to assist a prosecuting officer in the trial of a case, is an incidental power of the Court, and one not unfrequently exercised in cases of more than ordinary importance or difficulty. Without this power the public interests might suffer in many cases, and generally this evil would arise in cases where the greatest and most important interests were involved.

State *v.* Bartlett.

The selection and appointment of such persons lies in the discretion of the presiding Judge.   It cannot, upon any occasion, be demanded or refused as a matter of right.   The Judge called upon to preside must determine the propriety of the request at the time and under the circumstances of the case exhibited to him.   The exercise of this power is not the subject of exception unless it infringes some *rule of law.*   The needs and emergencies of the case are for his consideration and cannot be reviewed upon exceptions.   If a person *legally* disqualified be appointed, it may and will be remedied upon exceptions.

There are two kinds of appointments to which the attention of the courts upon several occasions have been directed. One is the appointment of a *prosecuting officer* to fill a vacancy existing in the office, and the other, the appointment of some person at the request of the *prosecuting officer* to aid him in the trial of the case.

The first is the appointment of an *officer;* a person who has the management and control of the prosecution; the other is simply that of a person to aid and assist *the officer,* and has no control over the case.

The difference between these two appointments, and the difference between the powers and duties of the one and that of the other, seem to have been entirely overlooked by the counsel in his argument upon this question.

One is made by virtue of statutory provisions and the other is not.   One is under certain statutory restrictions and the other is not.

Section 35 of chapter 77, R. S., in relation to Attorney General, provides, — " He shall not receive any fee or reward, from or in behalf of any prosecutor, for official services, or during the pendency of a prosecution, be engaged as counsel or attorney for either party in a civil action depending essentially on the same facts."

The same restrictions are imposed on county attorneys. R. S., c. 79, § 19.

These statutory restrictions apply to incumbents of these

several *offices* and do not extend beyond. Waiving, for the present, the effect of compensation expected, there is no statutory provision restricting the Court in the appointment of such a person. Therefore there is no cause of exception for the infringement of any statute right in the matter.

Neither is there the same, if indeed any, reason at all existing why such restrictions should, in such cases, be imposed. The *officer* is appointed for the term of a court, or elected for a term of years, and has the management and control of the case from its inception to its close, and may dispose of it at his will, but the person appointed to aid him has no control of the case to be influenced by pecuniary or other considerations, and is subject to removal by the presiding Judge at any moment.

The statute prohibits the attorney general and county attorney from receiving any fee or reward from, or engagement as counsel or attorney for either party in a civil action depending essentially on the same facts.

They cannot be counsel for the accused in such civil suits lest they, having the control of the case, may be influenced to dispose of it against the public interests. They cannot accept fee or reward, or be counsel against them, lest they may be influenced to prosecute when justice and the public interests would forbid it.

None of these reasons apply to the person appointed to aid the prosecuting officer. The case is at all times under the control and management of one who is under these restrictions and acting under an oath of office.

Our attention has been called to several cases in Massachusetts touching this matter, neither of which are in conflict with the rule stated in this case.

The first case is that of *Commonwealth* v. *Knapp*, 10 Pick., 478, in which Daniel Webster had been engaged to assist in the trial. It was a capital case, exciting great interest, and requiring in its investigations great legal knowledge and experience. A similar objection to that now presented was raised by the prisoner's counsel, based upon the statutory

provisions of that State, making it the duty of certain officers "*exclusively* to conduct the prosecution on the part of the Commonwealth."

The Court say, — " We have examined that statute (st. of 1807) and we are of opinion that it was not intended to prohibit the appointment of the counsellors of this Court *in aid of* the *law officers*, whenever the circumstances of the case should require the Court in the exercise of a sound discretion to make such appointment.  It is one of the incidental powers of the Court, and has heretofore been exercised in cases within our own recollection."

In the next case, *Com.* v. *Williams*, 2 Cush., 582, the Court say, as a *general* rule "the conducting of the case before the Court and jury is to be confined to the *public prosecutor*. But exceptions may occur to this rule, arising from peculiar circumstances applicable to particular cases, which would justify the Court in associating with the public prosecutor, at his request, additional counsel to aid him in the conducting of the case.  When this takes place, it must be at the request of the district attorney and under some stringent reasons arising in the particular case; and the control and direction of the case must be with the public prosecutor. We are to presume, this being a motion addressed in some degree to the presiding Judge, that proper reasons existed for granting the request of the district attorney."

The next case, in order of time, is *Com.* v. *Gibbs*, 4 Gray, 146.  This case presents the matter of the appointment of a *public prosecutor*, rather than a person to aid one.

The office of district attorney was vacant, and the appointment of a person to fill the vacancy for the time being devolved upon the Court.  A counsellor of the Court was appointed who "had previously been employed to commence several suits against two of the defendants and to defend an action of slander brought by one of the defendants, all of which, depending upon the same facts involved in the prisoners' case, then stood for trial."

This, it will be perceived, was *not* an appointment in *aid*

of a public prosecutor, but was the appointment of the *prosecuting officer* who should have the control and management of the case. The Court say,—" Such *substituted* officer must, for the time being, have the same powers with the regularly appointed officer, and have full management and control of the prosecution. He ought, then, to have the same general qualifications, to render him a suitable person for that duty, within the meaning of the statute" defining the duties of such an officer, which statute, they say, " after enumerating in previous sections the prosecuting officers, and providing for the appointment of a substitute for the time being, it enacts that ' none of the said officers shall receive any fee from or in behalf of any prosecutor, *or be concerned as counsel or attorney for either party, in any civil action depending on the same state of facts.'*" Therefore the counsellor appointed in that case, being appointed the *prosecuting officer*, was irregularly appointed, because the statute in terms forbade it, he then being " concerned as counsel or attorney in a civil action depending on the same state of facts."

Whether, if the regularly elected prosecuting officer had been present and desired the appointment of the same counsel to assist him, because of his acquaintance with the facts in the case, the Court would have regarded the appointment in aid of the district attorney as irregular, does not appear, but, in a subsequent case, where there was a *pro tempore* appointment of district attorney, a counsellor was appointed, who had been engaged as counsel against the prisoner in the same case, when it was " before the examining magistrate, and had also acted as clerk in certain proceedings relative to these fires, (the matters in controversy,) before a fire inquest, organized under their statute."

His appointment, under these circumstances, was not only regarded as unobjectionable, but the appointee, by reason of them, was considered better fitted to furnish aid to the government officer. The Court in their opinion say,—" The

reasons given in the argument for Mr. Burt's not being a suitable person, seem to us to indicate his peculiar fitness," from which arises a strong inference that, had the appointment in the former case been an aid to the district attorney, it would not have been objectionable, but regarded as fitting, because of his familiarity with the facts.

The purpose of the statute in such cases is to secure, in the controlling counsel, impartiality and freedom from influence by reason of pecuniary interest in the result.

It does not exclude the government from obtaining aid from any source, the control and management of the case being in hands free from influences dangerous to the cause of justice. The great end to be attained is a just conclusion and a true verdict in the case. Whether or not this can best and most surely be attained by the aid of others in conjunction with the prosecuting officer, must, when such aid is requested by such officer, be determined by the presiding Judge. Who is best adapted to accomplish those ends, must also be decided by him, and those decisions are not subject to revision here unless the person appointed be disqualified by some rule of law. There is no rule of law disqualifying the person appointed in this case.

The case was one of great interest, involving the examination of many witnesses, and the proof of many circumstances. The acting county attorney came to the examination of the case a stranger to all its details. Gen. Shepley, as a man of ability, integrity and honorable practice, was well known to the Court. There could have been no apprehension on the part of the prisoners' counsel that he would seek to deprive the prisoners of any privilege accorded them by the law of the land. The only real objection which could exist in the minds of the prisoners, was his ability so to present the facts and circumstances in the case, that the truth would be made to appear, and justice overtake them; a serious objection in their estimation, to be .sure, but one not recognizable by this Court as invalidating

a verdict. We have no doubt of the legality and fitness of the appointment. *Exceptions overruled.*
*Judgment on the verdict.*

APPLETON, C. J., CUTTING, DICKERSON and WALTON, JJ., concurred.