MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2025 ME 87
Docket:        Pen-21-256
Argued:        May 11, 2022
Reargued:      December 6, 2022
Decided:       August 29, 2025

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, and LAWRENCE JJ., and HUMPHREY, A.R.J.[*]

# STATE OF MAINE

v.

# DERRIC MCLAIN

STANFILL, C.J.

[¶1]  Derric McLain appeals from a judgment of conviction for aggravated drug trafficking (Class A), 17-A M.R.S. § 1105-A(1)(M) (2025), and violation of condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2025), entered by the trial court (Penobscot County, *A. Murray, J.*) after a jury trial. McLain was sentenced to fifteen years with all but eight years suspended and four years of probation.

[¶2]  Before trial, McLain moved to suppress evidence obtained during a traffic stop as well as evidence of statements he made to law enforcement while in custody.  The court (*Anderson, J.*) denied the motion to suppress.  McLain

---

[*] Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

2

argues that law enforcement lacked sufficient objectively reasonable suspicion of illegal drug activity to justify his prolonged detention at the scene before his arrest. He also argues that he did not waive his privilege against self-incrimination and that he invoked his right to counsel during a custodial interrogation. We affirm as to the stop, search, and arrest. Because we hold that McLain never waived his privilege against self-incrimination, however, we vacate the judgment of conviction and remand for further proceedings.

## I. THE STOP AND DETENTION

### A. Factual Background

[¶3] On June 11, 2020, the Maine Drug Enforcement Agency (MDEA) received a tip from a confidential source who worked at Rent-a-Wreck, a vehicle rental facility in Hampden. The source reported that a customer, Calvin Vandine, had a weekly pattern of renting a vehicle that he would use for about twenty-four hours and return after having driven several hundred miles. The conspicuous rental pattern led the source to suspect that Vandine was trafficking drugs.

[¶4] Special Agent Patricia McLaughlin was familiar with Vandine through her work for the MDEA and because she lived in the same area as he did. McLaughlin knew that Vandine used drugs, associated with known drug

traffickers, and experienced a non-fatal heroin overdose in 2018. To corroborate her personal knowledge, she consulted a local police database. The database showed that Vandine had several drug-related encounters with the police in 2019 and 2020, but it did not reveal any information indicating involvement in drug trafficking specifically.

[¶5] McLaughlin asked the police in East Millinocket, where Vandine lived, to stop Vandine's personal car if they encountered it and to drive by Vandine's house to see if his car was there. The East Millinocket police shared with McLaughlin the make, model, color, and license plate number of Vandine's personal car, and McLaughlin shared that information with MDEA Agent Paul Gauvin. Because the East Millinocket police did not find Vandine's car on either June 11 or 12, 2020, McLaughlin asked Gauvin to go to Rent-a-Wreck to look for Vandine's car. Although Gauvin did not find Vandine's car there, he learned from a Rent-a-Wreck employee that Vandine had returned the rental vehicle and left only a few minutes earlier with a man named "Kris," whom the employee described. The confidential source who had initially tipped the police off to Vandine's suspicious behavior had also told McLaughlin that "Kris" accompanied Vandine on past trips. The name and description led McLaughlin to believe that Vandine's travel companion was a suspected local drug

4

trafficker. Based on the initial tip, her research and knowledge of Vandine's drug-related history, the information about Vandine's companion, and her twelve years of experience in law enforcement, including five years with MDEA, McLaughlin deduced that Vandine was likely transporting drugs in and out of Maine.

[¶6] McLaughlin contacted Corporal Thomas Fiske of the Maine State Police and asked him to look for, stop, and hold Vandine's car until she could arrive and investigate. Meanwhile, Gauvin left Rent-a-Wreck and located Vandine's car, which he followed until Fiske arrived and initiated a traffic stop near Edinburg. Fiske initiated the stop because of the MDEA's request, although he noticed that the exhaust on Vandine's car was unusually loud and may have been in violation of a traffic law.

[¶7] Upon stopping Vandine's car, Fiske exited his cruiser, approached the car, and asked the occupants several routine questions. The driver identified himself as Calvin Vandine. The passenger gave his name as Kyle Bouchard. Fiske returned to his cruiser and checked Vandine's license, which revealed no warrants or suspensions. Fiske then called a K-9 officer, who said he would arrive in about twenty-five minutes with a drug-sniffing dog. Fiske

told the K-9 officer that he would try to "keep [Vandine and Bouchard] occupied" while he waited for the drug-sniffing dog to arrive.

[¶8]  About twelve minutes into the stop, Fiske reapproached Vandine's car and inspected the lights, blinkers, horn, and wipers.  He returned to his cruiser and remained there until McLaughlin arrived, about twenty-two minutes after the initial stop.  Fiske did not see any signs of drug use or possession during his interactions with Vandine and the passenger.

[¶9]  Once McLaughlin arrived, she and Gauvin approached Vandine's car together.[1]  Vandine and the passenger exited the car and Gauvin patted them down.  Gauvin found a small container in the passenger's pocket filled with a substance that he initially thought was fentanyl but later tested positive for the hallucinogenic methylenedioxyamphetamine (MDA).  Gauvin also noticed a hypodermic needle in the console next to the passenger seat.  McLaughlin and Gauvin then searched the car and found ninety-four grams of fentanyl.

[¶10]  At some point after McLaughlin arrived, she realized that the passenger who had identified himself as Kyle Bouchard was, in fact, Derric McLain.  McLaughlin recognized McLain and knew that he had several

---

[1] Gauvin had pulled over behind Fiske's cruiser when Fiske initiated the stop.  Gauvin testified that he did not approach Vandine's car until McLaughlin arrived because she was leading the investigation and it is standard practice for MDEA agents to work in pairs.

6

outstanding arrest warrants for offenses including drug trafficking. It is unclear exactly when in the sequence of events McLaughlin recognized McLain.

[¶11] Vandine and McLain were arrested and brought to the Penobscot County Jail for questioning. In total, the traffic stop lasted about twenty-eight minutes, ending about seven minutes after McLaughlin arrived.

## B.    Constitutionality of the Traffic Stop

[¶12] We review factual findings supporting the denial of a motion to suppress for clear error, and we review ultimate conclusions of law de novo. *State v. McNaughton*, 2017 ME 173, ¶ 28, 168 A.3d 807. We will affirm if any reasonable view of the evidence supports the court's denial of the motion to suppress.[2] *Id.*

### 1.    Standing

[¶13] As a threshold matter, the State argues that McLain lacks standing to challenge the constitutionality of the traffic stop because he had no reasonable expectation of privacy in either Vandine's car or, due to his outstanding arrest warrants, his own person. *See State v. Filion*, 2009 ME 23, ¶ 11, 966 A.2d 405 (requiring a defendant moving to suppress evidence to

---

[2] Because McLain does not allege any violation of the Maine Constitution in regard to the seizure, our analysis is limited to the federal constitution. *See State v. Wai Chan*, 2020 ME 91, ¶ 18 n.10, 236 A.3d 471.

"demonstrate that his own reasonable expectation of privacy was violated by the action of the State" (quotation marks omitted)). We disagree. Traffic stops intrude on the privacy of passengers and drivers alike; all occupants are subjected to a Fourth Amendment seizure. *See Brendlin v. California*, 551 U.S. 249, 257-59, 263 (2007); *accord United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994). *Brendlin* also supports the conclusion that McLain had a reasonable expectation of privacy in his person despite his outstanding arrest warrants. Like McLain, Brendlin was a passenger who had an outstanding arrest warrant unrelated to the reason for the traffic stop of the vehicle he was in. *Brendlin*, 551 U.S. at 252-53. The warrant notwithstanding, the United States Supreme Court held that Brendlin was seized and had standing to challenge the constitutionality of the seizure. *Id.* at 263; *cf. State v. Gardner*, 984 N.E.2d 1025, 1030 (Ohio 2012) (condemning the notion that discovering an outstanding arrest warrant after an otherwise unlawful seizure absolves any underlying constitutional violation). McLain therefore has standing to contest the stop of the vehicle and the seizure of his person.

## 2. Reasonable Articulable Suspicion of Illegal Drug Activity

[¶14] Although it was not the officer's subjective reason for the stop, the parties agree that law enforcement's observation of a mechanical defect was

sufficient justification to stop Vandine's car. *See Whren v. United States*, 517 U.S. 806, 811-14 (1996) (holding that a traffic stop is justified when law enforcement has probable cause to believe that a traffic violation has occurred even if they have ulterior motives for stopping the vehicle); *State v. Sasso*, 2016 ME 95, ¶ 15, 143 A.3d 124 (holding that "the officer's subjective motivation is not relevant to the determination of the reasonable, articulable suspicion necessary for a valid traffic stop"). McLain argues, however, that the court erred in holding that law enforcement also had a reasonable articulable suspicion of illegal drug activity sufficient to justify the initial stop and the detention that followed.

[¶15] The Fourth Amendment to the United States Constitution guards against seizures, including investigative traffic stops, that are unreasonable. *See* U.S. Const. amend. IV; *State v. Barclift,* 2022 ME 50, ¶ 8, 282 A.3d 607. A traffic stop is justified when, at the time of the stop, "an officer's assessment of the existence of specific and articulable facts indicating a possible violation of law or a public safety risk is objectively reasonable under the totality of the circumstances." *State v. Simmons*, 2016 ME 49, ¶ 8, 135 A.3d 824 (quotation marks omitted); *see Barclift,* 2022 ME 50, ¶ 8, 282 A.3d 607; 29-A M.R.S.

§ 105(1)(C) (2025) (authorizing law enforcement to stop a vehicle and question its occupants upon reasonable suspicion of criminal activity).

[¶16]  We review de novo a conclusion that an officer's suspicion of criminal activity was objectively reasonable—that is, more than mere speculation or an unsubstantiated hunch.  *Simmons*, 2016 ME 49, ¶ 8, 135 A.3d 824.  We must give "due weight . . . to the specific reasonable inferences which [law enforcement officers are] entitled to draw from the facts in light of [their] experience."  *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *accord United States v. Ruidíaz*, 529 F.3d 25, 29 (1st Cir. 2008).  "[R]easonable articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence," *State v. LaForge*, 2012 ME 65, ¶ 10, 43 A.3d 961 (quotation marks omitted), and it can "rest on the collective knowledge of the police," *State v. Carr*, 1997 ME 221, ¶ 7, 704 A.2d 353.

[¶17]  Contrary to McLain's contentions, law enforcement had reasonable articulable suspicion of illegal drug activity sufficient to justify stopping Vandine's car.  The record shows that law enforcement knew the following at the time of the stop:

- Vandine routinely traveled a substantial distance from his home to the Hampden Rent-a-Wreck to rent vehicles;

10

- About once a week, Vandine would rent a vehicle for about twenty-four hours, during which he drove several hundred miles;

- Vandine was a known drug user who had experienced a non-fatal heroin overdose in 2018;

- Vandine associated with known drug traffickers;

- Vandine had several drug-related police encounters in 2019 and 2020;

- Consistent with his historical pattern, Vandine returned a rented vehicle to the Rent-a-Wreck on June 12, 2020;

- On June 12, 2020, Vandine was accompanied by a man named "Kris" who had the same first name and physical features as a local suspected drug trafficker; and

- Vandine had been accompanied by "Kris" on past brief, high-mileage trips in rental cars.

[¶18 ] Under the totality of the circumstances, those specific, articulable facts and the inferences that law enforcement drew from them, *see Terry*, 392 U.S. at 27, pass the low threshold for reasonable suspicion, *see Laforge*, 2012 ME 65, ¶ 10, 43 A.3d 961. The confidential source who provided the initial tip and who later described Vandine's companion was known to law enforcement and was reliable, having provided MDEA with credible information in the past about individuals using rental vehicles for illegal drug activity. Although consistency with characteristics or actions typical of drug activity, or a "drug courier profile," generally does not amount to reasonable

suspicion on its own, *see Reid v. Georgia*, 448 U.S. 438, 440-41 (1980), McLaughlin had personal knowledge of Vandine's involvement with drugs, which she corroborated against a local police database and drew reasonable inferences from based on her twelve years of law enforcement experience, including five years with the MDEA. *See United States v. Monteiro*, 447 F.3d 39, 47 (1st Cir. 2006) (noting that corroboration of a tip may come in part from an individual's recent arrest or affiliation for related conduct).

[¶19] Fiske was acting on reasonable suspicion imputed from McLaughlin, not an inchoate hunch, when he stopped Vandine's car with McLain in it. *See Carr*, 1997 ME 221, ¶ 7, 704 A.2d 353. Thus, the court's factual findings were not clearly erroneous and support the conclusion that there was a reasonable articulable suspicion that drug trafficking was occurring, justifying the traffic stop.

### 3. Duration of the Traffic Stop

[¶20] Having determined that law enforcement had sufficient reasonable suspicion of illegal drug activity to justify initiating the traffic stop, the suppression court determined that the stop was reasonable in duration because it lasted only as long as was necessary for law enforcement officers to investigate their suspicions of a mechanical defect and illegal drug activity.

McLain argues that because only a mechanical defect justified the initial stop, it was unduly and unconstitutionally prolonged, constituting a de facto arrest, after Fiske finished inspecting the car for any mechanical defects. We agree with the court's determination.

[¶21] "When an investigating officer's actions during the stop exceed what is necessary to dispel the suspicion that justified the stop, the detention may amount to an arrest and is lawful only if it is supported by probable cause." *State v. Blier*, 2017 ME 103, ¶ 8, 162 A.3d 829 (quotation marks omitted); s*ee Carr*, 1997 ME 221, ¶ 7, 704 A.2d 353 ("Reasonable and articulable suspicion to conduct an investigatory stop can rest on the collective knowledge of the police."). If the mechanical defect had provided the only basis for the stop, we would agree that the length of the stop would have been unreasonable, ripening into a de facto arrest. *See Rodriguez v. United States*, 575 U.S. 348, 350-52 (2015) (holding that the extension of a lawful stop for a mere seven or eight minutes beyond what was necessary to handle the matter violated the United States Constitution's prohibition on unreasonable seizures). Here, however, law enforcement had reasonable suspicion of drug trafficking from the outset of the stop. Thus, the question is whether the duration of the stop exceeded

what was necessary to dispel the suspicion of drug trafficking, not just the suspicion of the mechanical defect.

[¶22]  In assessing whether an investigative stop has ripened into a de facto arrest, courts should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  Courts should also "consider whether the police are acting in a swiftly developing situation, and in such cases [courts] should not indulge in unrealistic second-guessing." *Id.*

[¶23]  In this case, twenty-two minutes passed between the beginning of the stop and McLaughlin's arrival on scene.  During the first few minutes of the stop, Fiske approached the vehicle and asked routine questions, and he then went back to his cruiser where he notified other officers and conducted a license check.  He then returned to the vehicle and conducted a mechanical inspection, including the lights, blinkers, horn, and wipers.  Fiske and Gauvin then waited for McLaughlin, who had left her location immediately upon learning of the stop and arrived about seven minutes later.  McLaughlin was the lead investigator and the only law enforcement officer involved in the investigation with personal knowledge of Vandine.  MDEA's standard practice is that agents work in pairs.  Thus, the decision to wait for McLaughlin

14

prolonged the stop by only seven minutes more than the time needed for the mechanical defect investigation.

[¶24] Viewed in the light most favorable to the court's decision, *see Simmons*, 2016 ME 49, ¶ 4, 135 A.3d 824, the suppression record supports the court's findings and its conclusion that the duration of the stop was reasonable and did not amount to a de facto arrest.[3] We thus affirm the denial of the motion to suppress evidence found during the vehicle search because the stop was justified and not unreasonably prolonged under the circumstances.

## II. THE PRIVILEGE AGAINST SELF-INCRIMINATION

### A. Factual Background

[¶25] After law enforcement discovered the drugs, McLain was arrested and brought to the Penobscot County Jail, where he was interviewed by Gauvin and Special Agent John Knappe. Gauvin read McLain his *Miranda* rights. After he read each right out loud, Gauvin asked McLain: "Do you understand that?" McLain replied "yes" each time. The following exchange next occurred:

> **Agent Gauvin**: Now, having all those rights which I explained to you in mind, do you wish to answer questions at this time?

---

[3] Reinforcing our holding that the duration of detention was reasonable is the fact that McLain himself had a hand in prolonging the stop by giving a false identity. Had McLain identified himself accurately, Fiske would have discovered McLain's outstanding arrest warrants, including one for drug trafficking, when checking his license around six to seven minutes into the stop, in which event Fiske would have been justified in arresting McLain on the spot. *See Sharpe,* 470 U.S. at 688 (holding that a twenty-minute stop is reasonable when the police have acted diligently and the suspect's actions contributed to the delay).

> **McLain**: Depends on the questions.
>
> **Agent Gauvin**: Well, I mean, it's . . . . Yes or no? I know "it depends" but, I—I—I understand that, but, that's what I, you know, that's why I read you your rights.
>
> **McLain**: Is there a lawyer here?
>
> **Agent Gauvin and Special Agent John Knappe**: No.
>
> **McLain**: What do you want . . . what, what questions?

The officer then said, "you know why you're here, you know, you're being charged with aggravated trafficking in scheduled drugs, plus your six warrants." McLain said yes and asked about the warrants. The officer indicated he did not know what the warrants were for. When Gauvin again asked whether McLain wanted to answer questions, McLain responded, "That depends, obviously." Gauvin and Knappe did not clarify any further but immediately asked McLain about his heroin use and the details of that day's drug run.

[¶26] McLain moved to suppress statements he made during the interrogation, arguing that he did not waive and at least ambiguously invoked his constitutional right against self-incrimination. The motion court concluded that the statements did not need to be suppressed because McLain had waived his right against self-incrimination. The motion court did not make any findings

with regard to whether McLain thereafter invoked the right by requesting a lawyer. After the first oral argument, we invited the parties and amici curiae to submit additional briefing in response to three questions regarding the right to counsel attendant to the privilege against self-incrimination under Maine law and the Maine Constitution. McLain argues that the motion court erred because he did not waive his privilege against self-incrimination in the first place, and even if he did, he later invoked his attendant right to counsel when he asked, "Is there a lawyer here?"

[¶27]   We conclude that under article I, section 6 of the Maine Constitution, McLain did not waive his privilege against self-incrimination, as evidenced by his question: "Is there a lawyer here?"  We further conclude that, even when a valid waiver has occurred, if an individual thereafter ambiguously or equivocally invokes the right to counsel during custodial interrogation, the police must either cease questioning or clarify the request to determine whether the individual is invoking the right to remain silent.

B.    **Legal Analysis**

1.    **Guiding Principles of the Primacy Approach**

[¶28] When examining whether a criminal defendant has waived a right guaranteed by the Maine Constitution, we "apply a bifurcated standard of

review, reviewing any express or implicit factual findings for clear error, and the legal conclusion to be drawn from those facts de novo." *State v. Watson*, 2006 ME 80, ¶¶ 14, 31, 900 A.2d 702.

[¶29]  Our primacy approach requires us to analyze claims under the Maine Constitution before analyzing claims under the federal constitution. *State v. Athayde*, 2022 ME 41, ¶ 20, 277 A.3d 387.  "[F]ederal decisions do not serve to establish the complete statement of controlling law but rather to delineate a constitutional minimum or universal mandate for the federal control of every State." *State v. Caouette*, 446 A.2d 1120, 1122 (Me. 1982)*; see Oregon v. Hass*, 420 U.S. 714, 719 (1975) ("[A] State is free *as a matter of its own law* to impose greater restrictions on police activity than those [the United States Supreme Court] holds to be necessary upon federal constitutional standards*.*")  We thus analyze McLain's claim under article I, section 6 of the Maine Constitution.[4]

[¶30]  In interpreting the Maine Constitution, we look first at the text and then at Maine precedent to determine whether either provides a definitive answer to the question posed.  If they do not, we proceed to examine, without limitation, the general purpose of the provision at issue, its historical context,

---

[4]  Because we conclude that the motion to suppress should have been granted under the Maine Constitution, we need not address McLain's federal constitutional claim.

any related statutes, and the common law, together with sociological and economic considerations and relevant precedent from other jurisdictions. *See Winchester v. State*, 2023 ME 23, ¶¶ 14-21, 291 A.3d 707; *State v. Moore*, 2023 ME 18, ¶ 18, 290 A.3d 533.

### 2.    Application of the Primacy Approach

#### a.    Text

[¶31]  The relevant text of article I, section 6 provides: "In all criminal prosecutions, . . . [t]he accused shall not be compelled to furnish or give evidence against himself or herself . . . ."  Me. Const. art. I, § 6.  The plain text of article I, section 6 does not answer whether a waiver of constitutional rights after law enforcement's recitation of warnings concerning the rights or after an invocation of such rights must be explicit before a law enforcement officer may interrogate a suspect in custody.

#### b.    Maine Precedent

[¶32] No decision of ours interpreting state law squarely addresses the issue at hand.[5]   Nevertheless, our case law provides helpful guidance.

---

[5]  In decisions interpreting federal law, we have repeatedly said that the State must prove by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived the privilege against self-incrimination.  *See State v. Figueroa*, 2016 ME 133, ¶ 14, 146 A.3d 427; *State v. Coombs*, 1998 ME 1, ¶ 15, 704 A.2d 387; *State v. Marden*, 673 A.2d 1304, 1308-09 (Me. 1996); *State v. DeLong*, 505 A.2d 803, 808 (Me. 1986); *State v. Knights*, 482 A.2d 436, 440 (Me. 1984).  At a minimum, the accused's "conduct must demonstrate an intentional relinquishment or abandonment of known rights."  *State v. Lockhart*, 2003 ME 108, ¶ 21, 830 A.2d 433; *see id.* ¶¶ 22-24 (holding that

### i.     Warnings

[¶33]  We have previously observed that we have not yet ruled whether, under the Maine Constitution, a recitation of rights must be given to a suspect in custody prior to interrogation.  *Athayde*, 2022 ME 41, ¶ 37 n.7, 277 A.3d 387 (citing *State v. McKechnie*, 1997 ME 40, ¶ 7 n.1, 690 A.2d 976).  We have, however, explained that under the Maine Constitution's due process clauses,[6] "the recitation of the defendant's rights followed by waivers are cogent factors supporting the conclusion that a confession is voluntary."  *Id.*  We have also long noted a distinction in the analysis between a person who is uninformed of the person's rights and a person who is fully apprised of those rights "and informed that he is under no legal obligation to disclose any facts prejudicial to himself, or to give evidence against himself."  *State v. Gilman*, 51 Me. 206, 223-24 (1862).

> Great care should undoubtedly be taken to protect the rights of the accused.  His secret should not be extorted from him by the exercise of any inquisitorial power.  He should be fully informed of his legal

---

the accused waived his privilege when he understood each of the *Miranda* rights, and when the detective asked, "Now having all those rights which I just explained to you in mind, do you wish to answer questions at this time?" he responded, "Please, if I can").  Further, "[w]hen an individual has not yet made a valid waiver of the *Miranda* rights and invokes, even ambiguously, the right to remain silent or the right to an attorney, he or she has invoked the *Miranda* rights."  *Id*. ¶ 27.  Because these decisions were interpreting federal constitutional law, they are not directly relevant to our primacy approach to consideration of the Maine Constitution.  *See Winchester*, 2023 ME 23, ¶ 14, 291 A.3d 707.

[6] We have observed that the Maine Constitution has both express and implied due process clauses. *See NECEC Transmission LLC v. Bureau of Parks & Lands*, 2022 ME 48, ¶¶ 41-42, 281 A.3d 618 (discussing Me. Const. art. 1, §§ 1, 6, 6-A).

rights, when called upon or admitted to testify as a witness in a matter in which his guilt is involved.

*Id.* at 225; *see also Newell v. State*, 277 A.2d 731, 733 (Me. 1971) (noting that petitioner's election to forgo an attorney was not a knowing and understanding waiver when the petitioner did not know whether an indigent person charged with a misdemeanor in Maine had a right to appointment of counsel), *overruled on other grounds by State v. Cook*, 1998 ME 40, 706 A.2d 603.

### ii.    Explicit Waiver or Invocation of the Privilege

[¶34]   We also have not addressed the extent to which a waiver or invocation[7] must be explicit in the context of custodial interrogation, but again our precedent in other contexts is illuminating.

[¶35]    In *State v. Collins*, we stated that the privilege against self-incrimination requires that custodial statements be excluded unless the suspect waived the "constitutional privilege against self-incrimination by choosing, freely and knowingly, to provide criminal self-condemnation by utterances from [their] own lips." 297 A.2d 620, 626 (1972).

[¶36]  Addressing whether a defendant had waived his right to counsel to represent him at trial, we explained that under article 1, section 6, the right

---

[7] Waiver and invocation are necessarily related because a suspect may waive the right to remain silent but can retract that waiver with an invocation of the right at any time. *See McNaughton*, 2017 ME 173, ¶ 29, 168 A.3d 807.

to representation by counsel "is a fundamental constitutional right" and therefore "requires that every reasonable presumption must be indulged against waiver." *Watson*, 2006 ME 80, ¶ 15, 900 A.2d 702.

[¶37] Our precedent demonstrates a strong commitment to ensuring that rights under the Maine Constitution are protected. In rejecting a claim of a waiver of First Amendment rights, we stated that while "[i]t is well settled that a party may waive its constitutional rights, . . . that waiver must be clear and unequivocal." *Verizon New Eng., Inc. v. Pub. Utils. Comm'n*, 2005 ME 16, ¶ 14, 866 A.2d 844 (citing *Jacques v. Am. Home Assurance Co.*, 609 A.2d 719, 721 (Me. 1992) (holding that a party did not relinquish its due process rights because there was no evidence of a clear, unequivocal waiver)).

[¶38] Finally, in *Gendron v. Burnham*, 146 Me. 387, 389, 396, 82 A.2d 773, 777, 780 (1951), we concluded that a grand jury witness had effectively invoked his privilege against self-incrimination when he refused to answer certain questions even though he did not explicitly state that he was relying on his privilege.

[¶39] In sum, while none of our precedent is directly on point, our decisions collectively demonstrate the importance that we give to the requirement that a waiver be voluntary, knowing and intelligent. Our

precedent also suggests that invocations of a constitutional right need not be explicit before interrogators must stop to clarify whether suspects are in fact waiving or invoking their constitutional rights.

### c. History, Common Law, and Statutes

[¶40] Because neither the constitutional text nor our precedent definitively answers the specific questions presented, we consider other sources of potential guidance.

[¶41] The privilege against self-incrimination existed before the adoption of our state constitution in 1820 and stemmed from the common law. *Gilman*, 51 Me. at 215 ("That no one is bound to accuse or betray himself, are maxims of the common law. Nor shall he be bound, in a criminal case, to furnish or give evidence against himself."). We explained in *Gendron* that article I, section 6 "crystallized into [an] absolute guarant[ee] that common law privilege which is and always has been one of the cherished rights of the English and American peoples." 146 Me. at 395, 82 A.2d at 780.

[¶42] At the time that this common law privilege was enshrined as a constitutional right, defendants were not permitted to testify at trial. *See State v. Bartlett*, 55 Me. 200, 217 (1867). Professional police forces did not yet exist. Wesley MacNeil Oliver, *Magistrates' Examinations, Police Interrogations, and*

Miranda-*Like Warnings in the Nineteenth Century*, 81 Tul. L. Rev. 777, 778
(2007).  Hence, any questioning of suspects was likely done by magistrates or
even by a coroner.  *See id.*; *Gilman*, 51 Me. at 216.

[¶43]  As *Gilman* reflects, governmental authorities would warn suspects
prior to questioning to ensure that any statements they made would later be
deemed voluntary by the court.[8]  *See Gilman*, 51 Me. at 216; Oliver at 778;
Tracey Maclin, *Comprehensive Analysis of the History of Interrogation Law, with
Some Shots Directed at* Miranda v. Arizona, 95 B.U. L. Rev. 1387, 1398-99
(2015).

[¶44]  As a practical matter, the privilege grew in importance when
defendants began to be allowed to testify at trial.  Maine was the first
jurisdiction to enact legislation granting the right to testify.[9]  P.L. 1859, ch. 104;

---

[8]  As noted above, there is no Maine precedent deciding whether these warnings were
constitutionally mandated.  Although in 1896 the Supreme Court concluded that warnings were not
required under the Fifth Amendment, *Wilson v. United States*, 162 U.S. 613, 623 (1896), that
conclusion was reversed in 1966 in *Miranda*.  More recently, as discussed *infra*, the Supreme Court
has described *Miranda* warnings as a prophylactic safeguard broader than the federal constitutional
right itself. *See Duckworth v. Eagan*, 492 U.S. 195, 203 (1989).  A 1923 Kentucky decision summarizes
the practice in the states of providing warnings as dependent on how close the person asked
questions was to being considered a suspect. *Pruett v. Commonwealth*, 250 S.W. 131, 134 (Ky. 1923)
("It is practically conceded that, if the accused is under arrest at the time of the inquest and is sworn
as a witness, without being cautioned as to his privilege, such testimony is involuntary.").

[9]  The Supreme Court discussed the history of an accused's competence to testify in *Ferguson v.
Georgia*:

> The first statute was apparently that enacted by Maine in 1859 making defendants
> competent witnesses in prosecutions for a few crimes. This was followed in Maine in

24

*see* P.L. 1864, ch. 280 (expanding the right granted in 1859); *see Bartlett*, 55 Me. at 216.  In 1879, the Legislature expanded further upon the right and added statutory language to make clear that silence could not be commented upon.[10] P.L. 1879, ch. 92.

[¶45]  The privilege against self-incrimination "reflects a high priority commitment to the principle that excluded as available to government is any person's testimonial self-condemnation of crime unless" the privilege is "freely and knowingly" waived.  *Collins*, 297 A.2d at 626.  In other words, the privilege against self-incrimination works to ensure that any self-incriminating statements an individual makes are truly voluntary.  As a result, we have long held that the Maine Constitution provides greater protection against

---

1864 by the enactment of a general competency statute for criminal defendants, the first such statute in the English-speaking world. The reform was largely the work of John Appleton of the Supreme Court of Maine, an American disciple of Bentham. Within 20 years most of the States now comprising the Union had followed Maine's lead.

365 U.S. 570, 577 (1961) (citation omitted).

[10] We had originally ruled that such silence could be commented upon, *e.g.*, *Bartlett*, 55 Me. at 220; after the Legislature superseded that ruling by statute, however, we endorsed its action as protecting the privilege for everyone, both the guilty and innocent, *State v. Banks,* 78 Me. 490, 491-92, 7 A. 269, 270 (1886).  The current version of the statute is found at 15 M.R.S. § 1315 (2025):

In all criminal trials, the accused shall, at the accused's own request but not otherwise, be a competent witness. The accused may not be compelled to testify on cross-examination to facts that would convict or furnish evidence to convict the accused of any other crime than that for which the accused is on trial. The fact that the accused does not testify on the accused's own behalf may not be taken as evidence of the accused's guilt.

self-incrimination than that of the United States Constitution. In *Collins*, for example, we declined to follow federal law as embodied in *Lego v. Twomey*, 404 U.S. 477 (1972), and held that to satisfy the privilege against self-incrimination under the Maine Constitution, the prosecution must prove beyond a reasonable doubt that a confession is voluntary, 297 A.2d at 626-27.

> [W]e go beyond the objective of deterrence of lawless conduct by police and prosecution. We concentrate, additionally, upon the primacy of the value, strongly emphasized by the three dissenters in *Lego v. Twomey,* of safeguarding "the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances." Since this value has been endowed with the highest priority by being embodied in a constitutional guarantee—the constitutional privilege against self-incrimination—we believe that it must be taken heavily into account in the formulation of the public policy of this State . . . .

*Id*. at 626 (alteration and citation omitted) (quoting *Lego*, 404 U.S. at 491 (Brennan, J., dissenting)); *see State v. Rees*, 2000 ME 55, ¶¶ 5-8, 748 A.2d 976 (reaffirming *Collins*); *State v. Akers*, 2021 ME 43, ¶ 47, 259 A.3d 127 ("The Maine Constitution requires the State to meet a higher standard for demonstrating voluntariness than does the federal constitution.").

[¶46]  While this history is not dispositive, it again reflects an understanding of the importance of protecting the privilege, including by providing a recitation of rights and obtaining a clear waiver of the privilege prior to interrogating a suspect.

### d. Economic and Sociological Considerations

[¶47] We look to economic and sociological considerations because an "[a]nalysis of the scope of a constitutional protection can require consideration of the public policy for the State of Maine and the appropriate resolution of the values we find at stake." *Winchester*, 2023 ME 23, ¶ 24, 291 A.3d 707 (quotation marks omitted).

[¶48] When subject to custodial interrogation, individuals commonly "ask[] about the right rather than directly asserting it." Marcy Strauss, *The Sounds of Silence: Reconsidering the Invocation of the Right to Remain Silent Under* Miranda, 17 Wm. & Mary Bill Rts. J. 773, 788 (2009). They do that because "[u]sing questions, or even making statements with the voice raised at the end is a frequent form of elocution for persons who find themselves in an intimidating position or who feel powerless." *Id.*; *see* Peter M. Tiersma & Lawrence M. Solan, *Cops and Robbers: Selective Literalism in American Criminal Law*, 38 L. & Soc'y Rev. 229, 251-52 (2004). Other common responses by suspects in an intimidating situation include employing "modal verbs—indirect, tentative speech patterns," hedging their language, and expressing a "desire not to talk about specific topics." Strauss at 788-90, 796; *see also* Tiersma at 248-52. Those who employ more ambiguous speech constructions

are also more likely to have a lower socioeconomic status, or be a juvenile, person of color, immigrant, or woman. *See* Tiersma at 253-54; Ayesha I. Ahsan, Note, *"My Mirandas Don't Stand A Chance, with Cops": The United States Supreme Court's Impending Destruction of* Miranda *Rights Under the Pretense of Prophylaxis in* Vega v. Tekoh, 65 B.C. L. Rev. 1445, 1458-61 (2024); Harvey Gee, *Invoking the Right to Counsel and Right to Remain Silent: It's Just Not That Clear*, 32 Miss. Coll. L. Rev. 69, 79-80 (2013). As Justice Souter noted in his dissent in *Davis v. United States,* "[s]ocial science confirms what common sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant." 512 U.S. 452, 470 n.4 (1994) (Souter, J., dissenting); *see also State v. Purcell*, 203 A.3d 542, 564-65 (Conn. 2019) (explaining how socio-linguistic research science has revealed that requiring an unambiguous invocation penalizes most suspect and quasi-suspect classes).

[¶49] This research demonstrates that we cannot assume that an ambiguous response or invocation means that a suspect is not asserting the privilege. To the contrary, allowing interrogation to continue without clarifying a suspect's intent contradicts natural human behavior and puts an individual's constitutional rights at risk. This consideration, therefore, strongly supports

requiring an explicit waiver and that the police stop to clarify if the suspect articulates an ambiguous waiver or invocation of the privilege.

### e. Precedent From Other Jurisdictions

[¶50] Finally, we consider precedent from other jurisdictions to the extent that we find its reasoning persuasive.

### i. The Supreme Court

[¶51] In order to protect the Fifth Amendment privilege against self-incrimination, the United States Supreme Court recognized that safeguards were necessary before custodial interrogation could occur. *Miranda v. Arizona*, 384 U.S. 436, 467-79 (1966); *Florida v. Powell*, 559 U.S. 50, 59-60 (2010); *see State v. Figueroa*, 2016 ME 133, ¶¶ 13-14, 146 A.3d 427. Suspects must be informed about the right to have an attorney present, which is intended to ensure that the privilege is protected, *Figueroa*, 2016 ME 133, ¶¶ 13, 15, 146 A.3d 427, and is separate and distinct from the right to counsel that attaches at the commencement of adversarial criminal judicial proceedings under the Sixth Amendment of the United States Constitution and article I, section 6 of the Maine Constitution.

[¶52] The Supreme Court originally held that once warnings are given, "[i]f the individual indicates in any manner, at any time prior to or during

questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-474. "Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated." *Id.* at 475-476; *see State v. Coombs*, 1998 ME 1, ¶ 15, 704 A.2d 387 (noting that under federal law, the State must "establish[] a knowing, intelligent, and voluntary waiver of *Miranda* rights by a preponderance of the evidence"). Similarly, if a suspect invokes the right to counsel after having waived the privilege, questioning must cease until either counsel is available or the suspect initiates further discussions and again waives the right. *Smith v. Illinois*, 469 U.S. 91, 94-95 (1984); *State v. Curtis*, 552 A.2d 530, 532 (Me. 1988).

[¶53] As time went on, the Supreme Court began to erode the standards by which waiver and invocation of the privilege are judged. In *Davis*, the majority concluded that an ambiguous invocation of the right to counsel did not render statements obtained thereafter inadmissible.[11] 512 U.S. at 459. While

---

[11] Three Justices joined Justice O'Connor's opinion so concluding. *Davis*, 512 U.S. at 453. Justice Souter, joined by three Justices, concurred in the result based on the conclusion that, in the matter before them, the interrogator had stopped to clarify the defendant's statements and that clarification indicated that the defendant in fact wished to waive his right. *Id.* at 466-76 (Souter, J., concurring). Justice Scalia concurred separately, apparently agreeing with Justice O'Connor's reasoning on this point. *See id.* at 453, 462-65 (Scalia, J., concurring).

acknowledging that it was "good police practice" for interviewing officers to stop and clarify to "help protect the rights of the suspect" and to "minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel," the Court nonetheless concluded that absent an unambiguous request for counsel, the police had "no obligation to stop questioning" the suspect. *Id.* at 461-62. The Court stated that to impose such a restriction would undermine "the need for effective law enforcement." *Id.* at 461.

[¶54] More recently, in a five-to-four decision in *Berghuis v. Thompkins*, the Court concluded that the defendant's silence amounted to a waiver of his right to remain silent, explaining that there was "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel." 560 U.S. 370, 381, 385 (2010). Under *Thompkins*, then, federal law no longer requires an explicit and unambiguous *waiver* of the privilege against self-incrimination before questioning may occur. Rather, it "require[s] an accused who wants to *invoke* his or her right to remain silent to do so unambiguously." *Id.* at 381 (emphasis added). The majority repeated its reasoning that to exclude the statements

"would place a significant burden on society's interest in prosecuting criminal activity." *Id.* at 382.

[¶55] The Justices disagreeing with the majority views in *Davis* and *Thompkins* noted that the majorities' positions did not provide a bright line for the police because, by Justice O'Connors's own acknowledgement, the police would be confronted with courts second-guessing whether an invocation had been ambiguous or clear, while the police could avoid that by stopping to clarify any ambiguity. *See Davis*, 512 U.S. at 467 (Souter, J., concurring); *Thompkins*, 560 U.S. at 409-10 (Sotomayor, J., dissenting). Justice Souter noted that continuing to interrogate a suspect after the suspect's attempt to invoke the privilege could lead the suspect to deem any further objection to interrogation "as futile and confession (true or not) as the only way to end his interrogation." *Davis*, 512 U.S. at 472-73 (Souter, J., concurring). In *Thompkins*, Justice Sotomayor argued that to deem silence to imply a waiver was inconsistent with Supreme Court precedent and undermined the purpose of providing a warning. 560 U.S. at 398-400 (Sotomayor, J., dissenting). With respect to the majority's position that requiring an explicit waiver or invocation would impose a burden on effective law enforcement, Justice Sotomayor responded that "our system of justice is not founded on a fear that a suspect will exercise his rights." *Id.* at 410

32

(quotation marks omitted); *see also Davis*, 512 U.S. at 474 (Souter, J., concurring).

### ii.    Other Jurisdictions

[¶56]  A number of states have held that their constitutions require more robust protection than that of the federal constitution and require that if an attempted invocation is ambiguous, before continuing a custodial interrogation, officers must stop and clarify whether a suspect is attempting to invoke the privilege.[12]  For example, the Hawaii Supreme Court has interpreted its constitution to require that

> (1) when a suspect makes an ambiguous or equivocal request for counsel during custodial interrogation, the police must either cease all questioning or seek non-substantive clarification of the suspect's request, and (2) if, upon clarification, the defendant unambiguously and unequivocally invokes the right to counsel, all substantive questioning must cease until counsel is present. Conversely, . . . if, upon clarification, the defendant voluntarily, knowingly, and intelligently waives the presence of counsel, substantive questioning may continue.

*State v. Hoey*, 881 P.2d 504, 523 (Haw. 1994).  Minnesota also requires that police "cease questioning an accused once he or she has made an ambiguous or equivocal statement that could reasonably be construed as an invocation of the

---

[12]  Prior to the Supreme Court's decision in *Davis*, a significant number of lower federal courts, including the First Circuit Court of Appeals, required unambiguous invocations.  *See Davis*, 512 U.S. at 466 n.1 (Souter, J., concurring) (listing decisions).

accused's right to counsel, except for narrow questions designed to clarify the accused's true desires regarding counsel." *State v. Risk*, 598 N.W.2d 642, 648-49 (Minn. 1999); *see also Purcell*, 203 A.3d at 567; *Downey v. State*, 144 So.3d 146, 151 (Miss. 2014); *State v. Charboneau*, 913 P.2d 308, 318-20 (Or. 1996); *Steckel v. State*, 711 A.2d 5, 10-11 (Del. 1998); *cf. State v. Chew*, 695 A.2d 1301, 1316-18 (N.J. 1997) (finding the privilege against self-incrimination grounded in the common-law privilege from the state's founding instead of through a constitutional provision).

[¶57] The Massachusetts Supreme Judicial Court, when deciding whether to follow *Thompkins*, stated that "[t]o require a suspect, before a waiver, to invoke his or her right to remain silent with the utmost clarity, as called for by *Thompkins*, would ignore . . . long-standing precedent and provide insufficient protection for residents of the Commonwealth under [the Massachusetts Constitution]." *Commonwealth v. Clarke*, 960 N.E.2d 306, 319 (Mass. 2012). Following *Thompson* would "turn[] *Miranda* upside down by placing too great a burden on the exercise of a fundamental constitutional right." *Id.* at 320 (quotation marks omitted).

[¶58] We find the reasoning of Justice Souter, Justice Sotomayor, and these jurisdictions interpreting their counterparts to our self-incrimination

privilege more persuasive. The *Thompkins* approach to waiver prioritizes obtaining evidence over ensuring that a waiver of a constitutional right is truly knowing, voluntary, and intelligent. That has not been the Maine approach. To the contrary, Maine has a longstanding commitment to preserving the value reflected in the privilege against self-incrimination, even at the expense of highly probative evidence. *See Collins*, 297 A.2d at 627; *Rees*, 2000 ME 55, ¶¶ 7-9, 748 A.2d 976. Accordingly, the *Thompkins* approach does not serve Maine's policy priorities.

[¶59] Allowing continued questioning after an ambiguous waiver or invocation of the privilege does not provide a bright line for the police, but rather subjects the process to increased second-guessing hindsight. In practice, police can, and now in Maine must, simply clarify an ambiguous waiver instead of making a wrong guess. *See Thompkins,* 560 U.S. at 410 (Sotomayor, J., dissenting); Thomas O. Levenberg, *Fifth Amendment—Responding to Ambiguous Requests for Counsel During Custodial Interrogations*, 85 J. Crim. L. & Criminology 962, 985-87 (1995).

[¶60] More fundamentally, in the words of Justice Goldberg: "If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system." *Escobedo*

*v. Illinois*, 378 U.S. 478, 490 (1964); *see also Gendron*, 146 Me. at 396-97, 82 A.2d at 780 (quoting *United States v. White*, 322 U.S. 694, 698 (1944) ("The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime.")). Our system of justice requires that suspects are actually able to exercise their article I, section 6 privilege against self-incrimination and are not presumed to waive it by failing to utter magic words. We agree with the Massachusetts Supreme Judicial Court that an "ambiguous invocation . . . should not be treated as if the suspect had said nothing at all." *Clarke*, 960 N.E.2d at 320.

[¶61] In sum, requiring an explicit waiver and that an interrogator stop to clarify when a suspect in custody ambiguously invokes a constitutional right aligns more with our precedent and the importance we give to the privilege against self-incrimination. As supported by sociological considerations, we decline to endorse a rule that "could disadvantage the most vulnerable of our citizens." *Purcell*, 203 A.3d at 544.

[¶62] We hold that someone in custody must actually waive the privilege against self-incrimination in order for an interrogation to occur or continue.[13]

---

[13] This holding is consistent with our older, pre-*Thompkins* cases interpreting federal law. As we said in *State v. McCluskie*, "[e]ven an ambiguous reference by a suspect of the right to have an attorney

We do not specify that the waiver be given orally or in writing, but we require that it be clear and unequivocal, like we require for all waivers of constitutional rights. If the waiver of the privilege is ambiguous, an officer must, before any questioning, stop to clarify whether the individual is in fact waiving the privilege against self-incrimination. If, after a suspect waives the privilege against self-incrimination, there is any ambiguous invocation of the privilege, including the attendant right to counsel, the officer must stop any questioning and clarify whether the individual is attempting to invoke the privilege against self-incrimination. If the privilege is being invoked, questioning must cease.

## C.    Factual Analysis

[¶63]  We turn now to the facts of this case. The motion court's findings are uncontested, and the State has not challenged the court's determination that McLain was subjected to custodial interrogation. The only issue before us is whether McLain waived or invoked his constitutional privilege against self-incrimination under Maine law. McLain's statements are admissible only if he validly waived the privilege *and* did not subsequently invoke his right to counsel. *See supra* ¶ 62; Me. Const. art. I, § 6; *Figueroa*, 2016 ME 133, ¶ 14, 146 A.3d 427.

---

present requires that further inquiry be made to insure that he is not requesting an attorney and desires to continue the interrogation."  611 A.2d 975, 977 (Me. 1992).

[¶64] When first asked whether he wanted to answer questions, McLain said, "Depends on the questions." He then asked, "Is there a lawyer here?" to which two law enforcement officers responded, "No." McLain followed up, "What do you want . . . what, what questions?" After a brief discussion of the charges that McLain was likely facing and his outstanding warrants, the agent again asked, "Do you want to answer questions for me?" McLain's response was similar to his first: "That depends, obviously." The agents continued to ask questions, and McLain answered the questions until the interview concluded.

[¶65] The suppression court found that McLain waived his rights when speaking with the officer because "[h]is comment 'that depends' and his question 'is there a lawyer here?" reveal that he understood that he could answer some questions and not others, and after being told no lawyer was present, he could choose to answer questions or not." The court considered it to be a "selective waiver" and held that the officer could logically determine which questions the defendant would answer by asking them. In doing so, the court relied on *United States v. Eaton*, 890 F.2d 511 (1st Cir. 1989). That reliance, however, was misplaced. In discussing "selective waiver," the First Circuit specifically found that "the defendant's statement is *not* an assertion of his right to an attorney, nor is it an 'equivocal' assertion. There is nothing about

the statement (nor anything we can find elsewhere in the record) that suggests he wanted an attorney." *Id.* at 514.

[¶66] Here, in contrast to *Eaton*, McLain did not clearly waive his privilege against self-incrimination and instead answered that it "depend[ed] on the questions" when asked if he was willing to continue answering questions. At this point, Agent Gauvin initially attempted to clarify, stating, "Well, I mean, it's . . . . Yes or no? I know 'it depends' but, I—I—I understand that, but, that's what I, you know, that's why I read you your rights." McLain then asked if there was a lawyer present and never gave a "yes or no" answer. McLain never affirmatively expressed that he wanted to waive his privilege against self-incrimination. His conduct did not indicate that he knowingly, intelligently, and voluntarily waived his privilege against self-incrimination. To the contrary, McLain's question "Is there a lawyer here?" demonstrates an attempt to invoke his right to counsel as part of his privilege against self-incrimination and eliminates any doubt as to whether his earlier statement of "it depends" was a waiver of the privilege.[14] It was not. At that point, the

---

[14] For purposes of this analysis, we have assumed that the question "[i]s there a lawyer here?" was ambiguous and not a clear invocation of the right to counsel such that all questioning had to cease even under federal constitutional law. Not all would view it as ambiguous, however; some courts have found the very same question to be a clear invocation of the right to counsel. *See State v. Ikerman*, 698 S.W.2d 902, 907 (Mo. Ct. App. 1985), *abrogated on other grounds by State v. McNeely*, 358 S.W.3d 65, 72 n.5 (Mo. 2012); *Jordan v. State*, 591 A.2d 875, 881-82 (Md. 1991) (Eldridge, J., dissenting).

officers should have stopped and clarified how McLain wished to proceed. Under article I, section 6 of the Maine Constitution, interrogation must cease until the officers obtain a clear and unambiguous waiver of the right to remain silent, which they failed to do here.

## III. CONCLUSION

[¶67]  Because he did not clearly waive his article I, section 6 rights and the officers did not stop and clarify, McLain's custodial statements must be suppressed under the Maine Constitution.  We therefore vacate the portion of the suppression court's order that denied McLain's motion to suppress his responses to the agents' questions, and we vacate the conviction obtained after the admission of those incriminating statements.

The entry is:

> Judgment of conviction vacated.  Order denying the motion to suppress vacated in part; remanded for further proceedings consistent with this opinion.

Hunter J. Tzovarras, Esq. (orally), Bangor, for appellant Derric McLain

Aaron M. Frey, Attorney General, Jason Horn, Asst. Atty. Gen. (orally), and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

40

Maeghan Maloney, District Attorney, Prosecutorial District IV, Augusta, and Mark A. Rucci, Dep. Dist. Atty. (orally), Prosecutorial District V, Bangor, for amicus curiae Maine Prosecutor's Association

Carol J. Garvan, Esq. (orally), Zachary Heiden, Esq., and Anahita Sotoohi, Esq., American Civil Liberties Union of Maine, Portland, for amicus curiae American Civil Liberties Union of Maine

Penobscot County Unified Criminal Docket docket number CR-2020-1748
FOR CLERK REFERENCE ONLY